UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

MICHAEL J. COLOMBO                              Chapter 7
and DORIS J. COLOMBO

    Debtors.                          Bankruptcy No. 04-03139M

## MEMORANDUM DECISION

The matter before the court is the trustee's motion to compromise Michael J. Colombo's claims against Crawford & Co., debtor's former employer.  Prior to filing the petition in this case, Colombo had commenced an action in the United States District Court for the Southern District of Iowa, alleging employment discrimination and retaliatory discharge. Crawford & Co. has offered to settle the claims with the trustee for $20,000.00.

Hearing on the motion was held March 22, 2005.  Larry S. Eide, Chapter 7 trustee, appeared on his own behalf.  Hugh J. Cain represented Crawford & Co.  Mark D. Sherinian appeared as attorney for the debtor.

The court has jurisdiction of this matter under 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the District Court's order of reference.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## The Record

At the hearing, the trustee offered the testimony of Mark McCluskey, a Crawford & Co. manager.  The trustee also offered as Exhibit 1 portions of the transcript of a deposition taken of Colombo on June 16, 2004.  Counsel for Colombo objected to submission of a partial transcript.  The court provided the parties time to file briefs and to submit the full deposition transcript with exhibits.

On April 1, 2005, counsel for Crawford & Co. filed a brief in support of the trustee's motion (doc. #24).  Attached as an exhibit to the brief was a copy of a letter dated November 14, 2001 addressed to Crawford & Co. from attorney James Fitzsimmons.  On April 12, 2005, counsel for Colombo filed a brief in support of his objection to the motion with several attachments (doc. #28).  Attachment 1 is a "Functional Capacity Evaluation" dated April 15, 2002.  Attachments 2 and 3 are the transcript of Colombo's June 16, 2004 deposition without exhibits.  Attachment 4 is a December 18, 2002 ruling in an unemployment benefits appeal.  Attachments 5, 6, 7, and 8 are the transcript of a December 16, 2002 hearing in an unemployment benefits appeal.  On April 22, 2005, counsel for Crawford & Co. filed a reply brief (doc. #29).  On May 10, 2005, counsel for Colombo submitted copies of the deposition

2

exhibits to chambers.

The court will consider all attachments to the briefs, because neither party will be prejudiced thereby.  Moreover, the electronic filing of the transcript of Colombo's deposition is the only submission of that document to the court.

<u>Findings of Fact</u>

Michael Colombo, age 53, lives with his wife in Mason City.  They have two adult children.  Colombo is a high school graduate.  He was in the auto body repair business for several years and once co-owned an auto body shop in Mason City.  Later he began doing auto appraisals and acquired an auto appraisal franchise.

In January 1992 Colombo was hired as an auto appraiser by Crawford & Co., a national insurance adjustment firm.  Colombo worked out of his home in Mason City and commuted to the firm's Waterloo office.  His supervisor was in the firm's Des Moines office.  After a few years at Crawford & Co., Colombo's work changed somewhat.  He began doing more appraisals of commercial and residential buildings than vehicle appraisals.  In 2000 he was promoted to "commissioned adjuster-in-charge."

Crawford & Co. requires its adjusters to account for their activities and expenses on a "daycard."  A daycard is to

3

be filled out and faxed to the branch office each day.  The firm uses the daycards to calculate expenses charged to their insurance company clients.  Crawford & Co. has various agreements with its clients for billing mileage charges.  Some clients pay for all miles driven by the adjuster handling their files.  Others receive a certain number of "free" miles; they will not be charged for mileage unless the adjuster drives more than that number of miles.  Colombo referred to a client's free miles as "perimeter miles."

When Colombo was hired, a supervisor showed him how to fill out a daycard.  Colombo said he was instructed by his branch managers to enter perimeter miles on his daycard, as needed, in order to cover his expenses, including his mileage for commuting between Mason City and Waterloo.  Deposition at 47-52.  This procedure allowed him to be reimbursed for actual expenses without charging them to a client.  Colombo said he was not reimbursed for all the miles he actually drove.  Chuck Runcie was his manager in 1992.  Russ Wolf became his manager in 1998.

While Colombo was employed by Crawford & Co., adjusters were reimbursed six cents per mile for driving company cars and forty cents per mile for driving their own vehicles. Colombo said Wolf authorized using perimeter miles also to

4

cover the expense of using a personal vehicle.  Deposition at
78.  When Colombo used his own vehicle, he requested
reimbursement at the lower company car rate using perimeter
miles, rather than at the higher rate.  He did this to avoid
paperwork; it involved "less of a hassle."  Deposition at 73-
75.  Using perimeter miles rather than actual miles was a
convenience that helped him complete large numbers of files
quickly.  Id. at 68, 88.

Colombo said he used his own equipment because the
company car provided by Crawford & Co. was too small to
accommodate the equipment needed for the job.  After a hail
storm in 2002, Colombo hired a "bucket truck" that lifted him
to the roof of houses.  He paid the truck rental himself.  He
did not ask his manager if he could hire the truck and did not
ask Crawford for reimbursement.  Id. at 96-97.

In January 2002, Crawford & Co. changed its policy
regarding billing clients.  The evidence did not disclose how
the new policy differed from the former one.  However,
adjusters were instructed never to charge more than actual
travel time and mileage.  If a trip involved multiple
appointments, the total time and mileage were to be applied
pro rata to each appointment.

Colombo attended a meeting explaining the new policy.

5

Colombo said he asked Wolf at that time how the new policy would affect him, and Wolf said it would not affect him. Deposition at 84-85.

Wolf left Crawford & Co. at the end of May 2002. Mark McCluskey became branch manager in June 2002. Shortly thereafter, Colombo had a discussion with McCluskey about billing for mileage. He claims that McCluskey gave him permission to continue using the billing method that Wolf had approved. Deposition at 79-82. He admitted he was not in compliance with the terms of the new policy. Id. at 84.

Sometime in September, McCluskey began examining Colombo's daycards more closely. He noticed that Colombo consistently entered round numbers for his mileage. McCluskey found discrepancies in several instances between the mileage Colombo had entered on his daycard and McCluskey's estimate of the distance from Colombo's house to the client's location. McCluskey determined that Colombo was over-charging Crawford & Co. for mileage expenses. McCluskey did not give Colombo a warning or progressive discipline. On September 27, 2002, McCluskey and Rick Molden, a casualty adjuster in the Des Moines office, came to Colombo's home. McCluskey told Colombo he was terminated.

Columbo said in his deposition that his daycards did not

reflect greater expenses than he had actually incurred.  In
one situation, the client's place of business was just a few
miles from his house, but Colombo entered 60 miles on his
daycard for each of several vehicle appraisals done for the
client.  Colombo explained that the vehicles were not located
at the client's place of business.  He drove to other towns to
view the vehicles.  Deposition at 61-68.  In another
situation, he entered perimeter miles on his daycard to cover
expenses for using a personal vehicle.  Id. at 73.

Crawford & Co. contested Colombo's right to receive
unemployment benefits, contending he was discharged for
misconduct.  In December 2002, an administrative law judge for
the Iowa Workforce Development determined Colombo was not
disqualified from receiving benefits.  The findings in those
proceedings are not binding on this court.  Iowa Code §
96.6(4).

In August 1998 while doing an appraisal, Colombo fell
from the roof of a two-story building and injured his left
shoulder.  He had surgery in March 1999 and again in October
1999.  After his first surgery, he was given a lifting
restriction.  Deposition at 137.

Dr. Raymond L. Emerson released Colombo for work January
17, 2000 without restriction.  Dr. Emerson examined Colombo at

7

the Mason City Clinic on July 14, 2000. He made the following narrative report:

> Michael is about a year and a half after attempted superior labrum anterior posterior (SLAP) lesion repair, approximately 9 months after re-repair and open rotator cuff exploration and decompression. He has also been seen at the University of Iowa for a second opinion. In general, the patient feels better than when I last saw him. His problem comes from not being able to golf very comfortably. When he has his arm on the steering wheel it causes some discomfort. If he sleeps on that side, he will occasionally have some pain, but nothing that he can not tolerate. He is able to sleep at night and is not taking pain medications. He has been back to work.

Colombo's worker's compensation claim was handled by Debbie VanBlaricom in Crawford & Co.'s Davenport office. In a letter dated July 14, 2000, Dr. Emerson reported to Ms. VanBlaricom: "It is difficult to know if [Colombo] has reached maximum medical improvement yet, but I suspect he has. . . . I have to make an estimate of his impairment, which would equal 20% of the upper extremity."

On April 15, 2002, Colombo received a Functional Capacity Evaluation at a Mercy Medical Center facility. It appears that the evaluator was physical therapist Mike Haberman. The evaluation included lifting tests. The evaluation report appears to indicate that Colombo lifted 25 to 50 pounds using his right hand and lifted zero to ten pounds performing the same tests using both hands. The report states:

The patient reports that he is an insurance adjustor
and does a significant amount of driving.  He
reports that he is currently performing his normal
work duty activities.  He states that he has
modified the way that he does things, including
climbing ladders and opening car hoods. . . .
Overall, he was limited mostly with reaching to
shoulder level and above and with lifting.  After
attempting to perform the arm to the shoulder level
work with his left upper extremity, he had increased
pain for the remainder of the testing.

As of the time of his deposition, Colombo had not sought

treatment from health professionals for dealing with emotional

distress from the loss of his job.  Deposition at 132.

Colombo said he was advised orally by Dr. Emerson to

limit certain activities at work.  Id. at 91.  He believed he

had a lifting restriction and was not to do appraisals of two-

story houses.  Russ Wolf, his manager at the time, was aware

of these restrictions.  Id. at 93.

Sometime in mid-2002 there was a large hail storm in

Mason City.  Colombo asked his supervisors for assistance with

appraisals that would have required climbing a ladder to view

the property.  He may have asked for help on two or three

other occasions.  Colombo believed that the appraisers sent to

his area by Crawford & Co. were not helpful.  Id. at 121, 142.

Colombo believed Crawford thought he was "faking" the

seriousness of his injury.  Id. at 125.

Colombo was frustrated with Crawford & Co.'s handling of

9

his worker's compensation claim.  Colombo was to receive weekly checks from the Davenport office.  At that time, Mark McCluskey managed that office.  The checks were not issued regularly.  Colombo said delays in issuing checks interfered with his ability to pay hospital bills and on one occasion caused him to be denied treatment.  Colombo said he called the Davenport office repeatedly and called McCluskey two or three times.  Using the end of May 2002 as a reference point, Colombo estimated his calls to McCluskey took place a year to a year and a half earlier.  Colombo said he and McCluskey raised their voices with each other and exchanged inappropriate language.  Deposition at 125, 141, 146. McCluskey does not recall that there was inappropriate language.

Shortly after one of his surgeries, Colombo had a conversation with Rick Molden about industrial disability, a type of workers' compensation benefit.  Molden encouraged him to request benefits for industrial disability.

VanBlaricom discussed industrial disability benefits with Colombo.  He believed that Crawford & Co. would negotiate an amount for industrial disability after he had received all his weekly benefits.  Colombo said he called VanBlaricom sometime later to discuss the matter, and she had already closed his

file.  Id. at 139.

Columbo said that when he was fired, Molden expressed regret for telling him about industrial disability benefits because, in Molden's view, Colombo's pursuit of those benefits was the reason for his termination.  Deposition at 105-06.

In approximately November 2001 Colombo hired attorney James Fitzsimmons to pursue his workers' compensation claim.

Shortly after being terminated from Crawford & Co., Colombo received an offer of entry-level employment that would have required relocating to Minneapolis.  Deposition at 126-27.  Since January 2003, Colombo has been self-employed as an adjuster.  His work primarily involves appraising vehicles for insurance companies.

Colombo said he can no longer take out the trash, use a broom, use a push mower, swim, bowl, play volleyball, or hunt.  About once a week, his shoulder prevents him from sleeping.  He cannot hold his wife in his arms.  He would have difficulty washing his car by hand and usually takes it to the automatic car wash.  See Deposition at 25-43.

Colombo is right-handed.  He is able to "hunt and peck" at a keyboard with his right hand.  He can bend over, squat, crawl, bend his neck, twist his body, sit, stand, walk, run, dress himself, attend to personal hygiene, climb a ladder

slowly, go up and down stairs, use hand tools, golf, use a
riding lawn mower, operate a weed-eater, and drive a vehicle.
He has never applied for a handicapped parking sticker.  Id.

In his claim in the U.S. District Court for the Southern
District of Iowa, Colombo sought damages including lost wages.
His gross income from wages for 2001 was $64,031.

A few weeks prior to the hearing on this matter, Colombo
and Crawford & Co. settled his workers' compensation claim for
approximately $170,000.

Colombo filed a Chapter 7 bankruptcy petition on August
16, 2004.  The claims deadline was December 2, 2004.  Timely
claims were filed in the total amount of $65,400.23.

## Discussion

The court first addresses a question raised by the
parties as to whether approval of the settlement would
extinguish Colombo's interest in the claims against Crawford &
Co., or whether he would still retain an interest in a claim
for equitable relief.  Property of a bankruptcy estate is
comprised of "all legal or equitable interests of the debtor
in property as of the commencement of the case."  11 U.S.C. §
541(a)(1).  Causes of action belonging to the debtor at the
time of filing become property of the estate.  Mixon v.

12

Anderson (In re Ozark Restaurant Equipment Co., Inc.), 816
F.2d 1222, 1225 (8th Cir. 1987).  A personal injury claim
arising pre-petition becomes property of the estate in its
entirety.  Wischan v. Adler (In re Wischan), 77 F.3d 875, 876
(5th Cir. 1996).  This is so regardless of whether the claim
is unliquidated on the date of the filing or whether some
portion of the proceeds of the claim is attributable to post-
petition events such as future pain and suffering.  Id. at
876-77.  Colombo does not claim that a portion of the proceeds
of the claims would be exempt under Iowa law.  Therefore, he
is not entitled to retain any portion of his claims.  Approval
of the trustee's settlement will extinguish Colombo's entire
interest in claims against Crawford & Co. existing on the date
of the filing of his bankruptcy petition.

The trustee seeks approval of compromise of Colombo's
claims for $20,000.  The motion is governed by Fed.R.Bankr.P.
9019.  The court must consider:

(1) the probability of success in the litigation;

(2) the difficulties, if any, to be encountered in
the matter of collection;

(3) the complexity of the litigation involved, as
well as the expense, inconvenience and delay
necessarily attending it; and

(4) the paramount interest of the creditors and a

proper deference to their reasonable views.

Yates v. Forker (In re Patriot Co.), 303 B.R. 811, 815 (B.A.P.

8th Cir. 2004) (citing Drexel Burnham Lambert v. Flight

Transp. Corp. (In re Flight Transp. Corp. Securities

Litigation, 730 F.2d 1128 (8th Cir. 1984)).  The court should

approve a proposed compromise unless it falls "below the

lowest point in the range of reasonableness."  Yates v.

Forker, 303 B.R. at 815 (quoting Cosoff v. Rodman (In re W.T.

Grant Co.), 699 F.2d 599 (2d Cir. 1983)).

The trustee served the motion and notice of motion on all

creditors and parties in interest.  No creditor has objected

or expressed a view on the proposed settlement.  It does not

appear that collection of a judgment against Crawford & Co.

would present difficulties.  Litigation of the claims would

necessarily delay the administration of the estate.  A jury

trial would likely require expert testimony.  Counsel for

Crawford & Co. stated that discovery was completed or nearly

completed.

The determining factor is the trustee's likelihood of

success on the merits if the claims were litigated.  Crawford

& Co. contends that the claims have no value because it would

have been entitled to summary judgment in the district court

14

case.

The district court complaint was not offered in evidence. The parties agree that Colombo brought claims under two theories. He alleged his termination was in violation of federal or Iowa statutes which prohibit employment discrimination on the basis of a disability. He alleged also that Crawford & Co. terminated him in retaliation for pursuit of his workers' compensation claim.

<u>Disability Discrimination</u>

In order to establish a disability discrimination claim under either the Iowa Civil Rights Act, Iowa Code Chapter 216, or the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the plaintiff must first prove he is an individual with a disability. <u>Bearshield v. John Morrell & Co.</u>, 570 N.W.2d 915, 918 (Iowa 1997). The applicable definitions under the ADA and the Iowa CRA are very similar. <u>Pickens v. Soo Line Railroad Co.</u>, 264 F.3d 773, 779 (8th Cir. 2001), <u>cert. denied</u>, 122 S.Ct. 1917 (2002); <u>Bearshield</u>, 570 N.W.2d at 918. Therefore, whether the claim was brought under federal or Iowa law, cases interpreting the ADA are relevant to the court's analysis. <u>Nuzum v. Ozark Automotive Distributors, Inc.</u>, 320 F.Supp.2d 852, 858 (S.D. Iowa 2004); <u>Barnes v. Northwest Iowa</u>

15

<u>Health Center</u>, 238 F.Supp.2d 1053, 1063-64 (N.D. Iowa 2002);

<u>Bearshield</u>, 570 N.W.2d at 918.

> In order to establish a *prima facie* case of
> discrimination under the ADA, a plaintiff must
> demonstrate that (1) he is disabled within the
> meaning of the ADA; (2) he is qualified to perform
> the essential functions of his job with or without
> reasonable accommodation; and (3) he suffered an
> adverse employment action under circumstances that
> give rise to an inference of unlawful discrimination
> based on disability.

<u>Wood v. Crown Redi-Mix, Inc.</u>, 339 F.3d 682, 684 (8th Cir.

2003). A "disability" under the ADA is "a physical or mental

impairment that substantially limits one or more of the major

life activities" of an individual. <u>Toyota Motor Mfg.,</u>

<u>Kentucky, Inc. v. Williams</u>, 122 S.Ct. 681, 689 (2002) (quoting

42 U.S.C. § 12102(2)(A). A major life activity is an

activity such as "caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and

working." <u>Webner v. Titan Distribution, Inc.</u>, 267 F.3d 828,

834 (8th Cir. 2001) (quoting 29 C.F.R. § 1630.2(i)). The

Eighth Circuit has recognized standing, lifting, bending, and

twisting as additional major life activities within the

meaning of the ADA. <u>Wood v. Crown Redi-Mix</u>, 339 F.3d at 684 &

n.2.

An impairment "substantially limits" an individual under

the ADA if the person is "unable to perform a major life

activity" or is "significantly restricted as to the condition, manner or duration" under which he can perform that activity as compared to the ability of the "average person in the general population." Toyota, 122 S.Ct. at 690 (quoting 29 C.F.R. § 1630.2(j)).

In the Toyota case, the Sixth Circuit considered whether a Toyota employee was substantially limited in her ability to perform manual tasks. The Court of Appeals made this determination by examining her ability to perform manual tasks at work. The court disregarded her ability to tend to personal hygiene and to do household chores. Toyota v. Williams, 122 S.Ct. at 688. The Supreme Court held that this analysis was erroneous. Major life activities include seeing, hearing, and walking. "In order for performing manual tasks to fit into this category . . . the manual tasks in question must be central to daily life." Id. at 691. The Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." Id.

A medical diagnosis of an impairment is not sufficient to

establish disability.  A plaintiff must show the particular
limiting effect the impairment has on his daily life.  <u>Id.</u> at
691-92.

The standard for qualifying as disabled under the ADA is
"demanding."  <u>Id.</u> at 691; <u>see also</u> <u>Wood v. Crown Redi-Mix</u>, 339
F.3d at 686 (<u>Williams</u> case set a "high bar").  The Eighth
Circuit applies the <u>Toyota v. Williams</u> analysis in cases
involving major life activities other than "performing manual
tasks."  <u>Wood v. Crown Redi-Mix</u>, 339 F.3d at 685.

It is doubtful whether the trustee could make a *prima
facie* case for discrimination under the ADA.  Colombo claims
to be substantially limited in the major life activity of
lifting.  Crawford & Co. acknowledges that Colombo has a
physical impairment and that the Eighth Circuit recognizes
lifting as a major life activity. <u>See</u> <u>Wood v. Crown Redi-Mix</u>,
339 F.3d at 684 & n.2.  It is questionable, however, whether
the trustee could prove that Colombo is "substantially
limited" in the activity of lifting.

It is reasonable to assume that Colombo was told to limit
his lifting activity immediately after his surgery.  There is
no evidence that he was given a permanent lifting restriction
in any amount.  His ability to lift with his right hand, which
is his dominant hand, is not affected by his impairment.

18

Although his ability to lift with his left hand is diminished,
Colombo is still able to drive and work as an appraiser.  He
is able to perform a variety of personal and household tasks.
He is unable to engage in certain recreational activities, but
those activities are not of the type that are "of central
importance to most people's daily lives."  See Toyota, 122
S.Ct. at 691.  Moderate restrictions are not sufficient to
prove a disability; an impairment must "prevent or severely
restrict" a major life activity.  Wood v. Crown Redi-Mix, 339
F.3d at 685-86 (citing Toyota, 122 S.Ct. at 691); Nuzum v.
Ozark Automotive, 320 F.Supp.2d at 863-64.  Under the standard
for ADA claims imposed by Toyota, the court believes the
trustee would have difficulty proving Colombo has a
disability.


                       Retaliatory Discharge

     Colombo claims that Crawford & Co. terminated his
employment in retaliation for pursuing a worker's compensation
claim.  Colombo is an at-will employee.  Under the doctrine of
at-will employment, an employer may terminate an employee "at
any time, for any reason, or no reason at all."  Below v.
Skarr, 569 N.W.2d 510, 511 (Iowa 1997).  A narrow exception to
the at-will employment doctrine exists when the employee's

                              19

discharge would violate a public policy.  A "well-recognized
and defined public policy is violated when an employer
discharges an employee for exercising his rights under the
workers' compensation statute."  Id.

A claim for retaliatory discharge under Iowa law requires
a showing that "(1) the employee engaged in a protected
activity; (2) an adverse employment action occurred; and (3) a
causal link exists between the protected activity and the
adverse action."  Webner v. Titan Distribution, Inc., 267 F.3d
828, 835 (8th Cir. 2001) (citing Teachout v. Forest City Comm.
School Dist., 584 N.W.2d 296, 299 (Iowa 1998)).  To prove
causation in a wrongful discharge action, an employee must
show that the protected activity was a "determining factor" in
the employer's decision to terminate him.  "A factor is
determinative if it is the reason that tips the scales
decisively one way or the other, even if it is not the
predominant reason behind the employer's decision."  Webner v.
Titan, 267 F.3d at 835 (quoting Teachout, 584 N.W.2d at 302).

At the time of his termination, Colombo was pursuing
workers' compensation benefits.  For the trustee to succeed in
litigation, he would have to prove that Colombo's pursuit of
such benefits was a determining factor in Crawford & Co.'s
decision to fire him.  The trustee would be required to

20

present evidence that gives rise to an inference of retaliatory motive.  See Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (analyzing similar causation element in Title VII retaliation claim).  The evidence in this case is not strong.

Colombo was injured in 1998.  Sometime later he made a claim for workers' compensation benefits.  In about early or mid-2001, Colombo had discussions with Mark McCluskey about the delays in issuing his weekly benefits checks.  Colombo hired an attorney in about November 2001 to assist him in obtaining workers' compensation benefits.

In 2002, Crawford & Co. changed its policy on billing expenses.  Colombo did not change the way in which he charged for expenses.  McCluskey became Colombo's manager in June 2002.  Colombo was terminated in September.

The timing of an adverse employment action may offer circumstantial evidence of a retaliatory motive, but a mere coincidence of timing is not sufficient in itself to establish causation for a retaliatory discharge claim.  Webner v. Titan, 267 F.3d at 835.  The timing of events must be fairly close to create an inference of an employer's improper motive.  In Webner v. Titan, plaintiff was fired four days after filing a motion to compel his employer to allow videotaping of his

workstation.  The timing of this action, in conjunction with certain testimony by the employee's supervisor, was sufficient evidence from which a reasonable jury could find a retaliatory motive.  Webner v. Titan, 267 F.3d at 835-36.  In contrast, the Eighth Circuit in Kipp v. Missouri held that the interval of two months between plaintiff's filing an EEOC complaint and her termination "so dilute[d] any inference of causation" that the timing of events was not sufficient to establish causation as a matter of law.  Kipp v. Missouri, 280 F.3d at 897.  In Colombo's case, there is no temporal proximity between any particular action taken by Colombo and his termination.  Moreover, the remark allegedly made by Rick Molden, who was not Colombo's supervisor, regarding industrial disability benefits was not supported by other evidence that would create an inference of improper motive.  There was sufficient evidence to find that Colombo was terminated for failure to comply with billing policies.

Litigation of the claims would necessarily increase costs and delay the administration of the estate for an uncertain result.  The court concludes that the proposed settlement is reasonable and that the trustee's motion should be granted.

22

IT IS ORDERED that the trustee's motion to compromise is granted.

DATED & ENTERED: June 9, 2005

William L. Edmonds, Bankruptcy Judge